EXHIBIT D

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| LARRY HEARD a/k/a "Mr. Fingers" and ROBERT OWENS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | Case No. 20-cv-03678 |
| TRAX RECORDS, INC., PRECISION/TRAX RECORDS, an entity unknown legal origins, RACHAEL SHERMAN nee RACHAEL CAIN p/k/a SCREAMIN' RACHAEL, doing business as SCREAMING RACHAEL CAIN MUSIC and TRAX RECORDS, and JOHN DOES 1-10, | ) ) ) ) ) ) ) | Honorable Sharon J. Coleman Magistrate Sunil R. Harjani |
| Defendants. | ) | |
| TRAX RECORDS INC. and RACHAEL CAIN, | ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| v. | ) ) | |
| CASABLANCA TRAX INC., a Canadian Corporation CASABLANCA TRAX LIMITED PARTNERSHIP, a Canadian Limited Partnership, | ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

**THIRD-PARTY PLAINTIFFS' COMPLAINT AGAINST CASABLANCA
TRAX INC. FOR DECLARATORY JUDGMENT AND OTHER RELIEF**

Third-Party Plaintiffs, Trax Records Inc., an Illinois corporation ("Trax Records" or

"Trax") and Rachael Cain ("Cain"; Cain together with Trax Records are referred to as "Third-

Party Plaintiffs") for their complaint for declaratory judgment, breach of contract, and other

relief against third-party defendants, Casablanca Trax Inc. and Casablanca Trax Limited

Partnership (collectively, "Casablanca" or "Third-Party Defendant") state as follows:

## I.     PARTIES AND JURISDICTION

1.      Trax Records is an Illinois corporation with its principal place of business located in Cook County, Illinois.  Trax Records owned the Trax Music Catalogue (defined below) at all relevant times as alleged herein.  Larry Sherman ("Sherman") was the founder of Trax in 1986.  Sherman passed away in 2020.

2.      Rachael Cain is a resident and citizen of the State of Illinois.

3.      Casablanca Trax Inc. is an Ontario, Canada corporation with its principal place of business located in Toronto Canada.

4.      Casablanca Trax Limited Partnership is an Ontario, Canada limited partnership, the general partner of Casablanca Trax Inc., and has its principal place of business in Toronto Canada.

5.      The "Trax Music Catalogue" or "Trax Catalogue", as referenced herein means the collection of musical works, musical compilations, licensing agreements, copyrights in various artist works, master recordings and other works, rights, and, among other things, property interests from numerous artists around the world.

6.      The Trax Catalogue is the subject of a written license agreement between Casablanca and Demon Music Group Limited dated October 2007 ("Demon License Agreement").  A redacted copy of the Demon License Agreement is attached hereto as **Exhibit 1**.  The artists whose music and other works are the subject of the Trax Music Catalogue are referred to as the "Trax Artists".  The Trax Artists include Cain, Larry Heard and Robert Owens.

7.      Demon Music Group Limited of the BBC ("Demon") is a music catalogue marketing company that is owned by BBC Studios (the commercial arm of the British Broadcasting Corporation).  It engages in (and has engaged in since 2007) the exploitation of the Master Recordings and other works by the Trax Artists including the works of Heard and Owens

pursuant to the Demon License Agreement. On information and belief, Demon has exploited their works around the world, on the internet, on apps such as Spotify and Pandora, and, among other mediums, through the sale of actual vinyl recordings and CDs of the Trax Music Catalogue.

8. Casablanca, on the one hand, and Cain, Larry Sherman and Trax Records, on the other, are parties to a certain Settlement Agreement and Assignment dated November 19, 2012 ("Settlement Agreement"), pursuant to which Casablanca assigned to Cain and Sherman certain rights and interests in the Trax Music Catalogue including the Master Recordings. A redacted copy of the Settlement Agreement is attached hereto as **Exhibit 2**.

9. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the Third-Party Plaintiffs and the Third-Party Defendants are completely diverse and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

10. The Court has personal jurisdiction over Casablanca because it: (a) entered into written agreements with Cain, Sherman, and Trax Records that are substantially connected with Illinois, (b) acquired ownership, possession or control of an asset or thing of value that was present within the State of Illinois when ownership, possession or control was acquired, (c) transacted business within the State of Illinois, and (d) consented to jurisdiction in Cook County Illinois as part of the Settlement Agreement (Ex. 2 ¶ 8).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because: (a) a substantial part of the events or omissions giving rise to the claim occurred in Cook County, Illinois, (b) each Defendant is subject to the Court's personal jurisdiction in Cook County, Illinois, and (c) Casablanca consented to venue in this Judicial District as part of the Settlement Agreement (Ex. 2 ¶ 8).

## II.     BACKGROUND FACTS

12.     Cain and Sherman are producers, artists and musicians who spent their lives creating and recording music generally known as "House Music".

13.     Sherman, who passed away in April 2020, founded Trax Records in the mid-eighties.

14.     Trax Records is an iconic Chicago label that played a major role in the birth of House Music.  In its infancy, Sherman was the driving force behind Trax Records.  Throughout the eighties to early 2000, Sherman created and recorded a consortium of House Music and compiled a significant compilation of music, musical compositions, master recordings, copyrights and licenses to the artistic works of a significant number of artists including, Larry Heard and Robert Owens.

### CASABLANCA / TRAX JOINT VENTURE 2002

15.     Other than recording some songs with Trax Records in the mid-eighties, Cain did not become involved with the management or operation of Trax Records or the Trax Music Catalogue until early 2000.  Sherman and/or Trax Records owned the Trax Catalogue and had signed most of the Trax Artists before Cain's involvement in any management of Trax Records.

16.     In December 2002, Trax Records, Sherman and Cain entered into a Joint Venture Agreement with Casablanca, which was amended in or around March 2004 (the Joint Venture Agreement together with its amendment are collectively referred to as the "JVA"), pursuant to which Casablanca acted as trustee for the joint venture to collect all revenues generated under the JVA, to provide Trax with accountings, and, among other things, to account and pay Trax Artists the revenue and royalties to which they were entitled as a result of the exploitation and distribution of their music and other works.  Notwithstanding its role and obligations, Casablanca

4

did not pay royalties to the Trax Artists or provide Cain, Sherman, or Trax Records with required accountings.

**Casablanca / Trax 2005 Lawsuit**

17.     In 2005, Casablanca filed suit against Trax Records, Cain and Sherman for an alleged breach of the JVA.  The Court awarded Casablanca judgment in its favor and against Cain, Sherman and Trax Records (the "2005 Judgment").

18.     In June 2006 and on the basis of the 2005 Judgment, Casablanca purchased for itself the Master Recordings and Trax Music Catalogue pursuant to a sale under the Illinois Uniform Commercial Code ("UCC").

**The 2007 Demon License Agreement**

19.     In or around October 31, 2007, Casablanca and Demon entered into the Demon License Agreement, pursuant to which Casablanca licensed to Demon certain rights to the Trax Catalogue and the Master Recordings.  (Ex. 1.)  On information and belief, Demon paid Casablanca a significant advance under the Demon License Agreement ("Advance").

20.     Cain, Sherman, and Trax Records did not receive any portion of the Advance that Demon paid to Casablanca.  On information and belief, Casablanca did not pay any of the Advance to Heard or Owens.

**Trax Records Prevails on Appeal in 2008**

21.     Cain, Sherman and Trax Records appealed the trial court's 2005 Judgment.  After years of court battles and after Casablanca entered into the Demon License Agreement, the Illinois Appellate Court overturned the 2005 Judgment.

DM1\12239602.1

**2012 Settlement Agreement and Assignment**

22.     After Cain, Sherman, and Trax Records overturned the 2005 Judgment, they filed another lawsuit in Illinois State Court against Casablanca to regain ownership of the Trax Catalogue.  Litigation ensued.

23.     In or around November 19, 2012, the parties entered into the Settlement Agreement (attached hereto as Exhibit 2), pursuant to which Casablanca assigned certain interests of the Trax Music Catalogue and Master Recordings among other assets to Cain and Sherman.  Casablanca did not assign to Third-Party Plaintiffs the Demon License, any obligation to pay royalties to Trax Artists, or any debts or obligations owed by Casablanca to any party including  the Trax Artists such as Heard and Owens.

**The Demon License Agreement**

24.     Since October 2007 and pursuant to the Demon License Agreement, Demon had the right to exploit certain aspects of the Trax Catalogue and Master Recordings.  Paragraph 2 of the "General Terms and Conditions" of the Demon License Agreement identifies the license that Casablanca granted to Demon, which allowed Demon to, among other things, exploit: (a) the Masters and all recordings therefrom in all media, and, among other limited rights, (b) the right to use and publish the likeness of each artist whose work is embodied in the Masters.  (Ex. 1, p. 9 ¶ 2 (emphasis added).)

25.     Casablanca was obligated to pay royalties to the Trax Artists for revenue generated under the Demon License Agreement at all times during the existence of the agreement but has failed to do so.  (Ex. 1 ¶ 5, p. 3.)  The term of the Demon License Agreement is stated as the greater of 10 years from November 1, 2007, or 3 years from the date Demon Music recouped the "Advances" to Casablanca from "Royalties" generated by the license (as

those terms are defined in the Demon License Agreement). (Ex. 1 ¶ 6 p. 3.) On information and belief, Demon has not recouped the Advance. And it will not recoup the Advance at the current pace until 2027.

26. Neither Cain, Sherman, nor Trax is a signatory to the Demon License Agreement. It was not assigned to Cain, Sherman, or Trax as part of the Settlement Agreement. The obligation to pay royalties to Trax Artists including Heard and Owens for revenues generated under the Demon License Agreement was not assigned to Trax Records, Sherman or Cain.

27. In addition and as part of the Settlement Agreement, Trax Records, Cain and Sherman refused to accept any obligation to pay any debts or obligations under the Demon License Agreement or otherwise from Casablanca; the obligation to pay Trax Artists such as Heard and Owens was at all times Casablanca's obligation and remained so all times and remains with Casablanca to date.

### Demon and Casablanca's Failure to Pay Royalties

28. Since 2002, Casablanca has been required to account for and pay royalties to the Trax Artists including Heard and Owens whose music and other works were exploited by Casablanca as part of the JVA from 2002 to 2007 and then by Demon Music under the Demon License Agreement from November 1, 2007 and continuing to date. Despite these obligations, Casablanca has not paid Heard and Owens all of the royalties they claim are due.

29. As a result of the wrongful conduct of Casablanca, Third-Party Plaintiffs have been wrongfully and repeatedly accused of failing to pay royalties. The lawsuit filed by Heard and Owens is evidence of this very issue. Indeed, Cain is a Trax Artist who has not received the royalty payments from either Casablanca to which she is entitled.

30. Other Trax Artists who have not received royalty payments have resorted to the internet and social media to wrongfully blame Cain, Trax, and Sherman for Casablanca's failure and refusal to pay royalties. Their postings have significantly harmed the reputation of the Third-Party Plaintiffs.

31. This lawsuit seeks to redress (a) Casablanca's breach of the Settlement Agreement, (b) the inaccuracy of Casablanca's position regarding the enforceability of the Demon License Agreement against Third-Party Plaintiffs, who are neither signatories to nor assignees of the Demon License Agreement; and (c) the contractual obligation of Casablanca – not Cain, Sherman or Trax – to pay royalties to Heard and Owens and to account for revenue generated thereby to all parties.

## COUNT I
## DECLARATORY JUDGMENT, 28 U.S.C. § 2201

32. Plaintiffs reallege their allegations in the preceding paragraphs as their allegations to this paragraph.

33. First, Casablanca contends that it has the right to enforce paragraph 12 of the Casablanca License Agreement to require the sale of the Trax Catalogue, Master Recordings and intellectual property rights therein to Demon for $150,000. (Ex. 1 ¶ 12.) Third-Party Plaintiffs disagree.

34. Paragraph 12 of the Demon License provides in pertinent part:

For a period of ninety (90) days ("the Option Period") following the expiry of the Term the Licensee shall have the exclusive option (but not the obligation) to purchase from Owner the full copyright and all other rights in the Masters in perpetuity throughout the World for One Hundred and Fifty Thousand U.S. dollars (US$150,000) . . .

(Ex. 1 ¶ 12.)

35.     Casablanca does not have the right to enforce the terms of the Demon License Agreement against the Third-Party Plaintiffs (the assignees of the Trax Music Catalogue) because: (a) Casablanca assigned the Trax Catalogue and Master Recordings, among other assets, to Trax, Cain and Sherman as part of the Settlement Agreement; (b) the Demon License Agreement was not assigned to Third-Party Plaintiffs; (b) the Third-Party Plaintiffs are not parties or signatories to the Demon License Agreement; (c) the Demon License Agreement is unenforceable and/or terminable because of its indefinite Term of the license agreement; (d) the Trax Artists are not receiving royalties from either Demon or Casablanca; and, among other reasons, (e) the Settlement Agreement makes clear that Trax Records, Cain, and Sherman expressly refused to assume any of Casablanca's debts or liabilities such as selling the Trax Catalogue or paying royalties to Trax Artists.

36.     Accordingly, Third-Party Plaintiffs request a declaratory judgment from this Court that paragraph 12 of the Demon License Agreement is not enforceable against Third-Party Plaintiffs.

37.     Second, Casablanca contends that it is not obligated to pay royalties to artists such as Heard and Owens whose music and other works have been exploited by Demon under the Demon License Agreement.  Casablanca contends it became the responsibility of Cain and Sherman to pay royalties to the Trax Artists upon execution of the Settlement Agreement such that Third-Party Plaintiffs are obligated to pay royalties beginning on November 19, 2012 and continuing until the expiration of the "Term" of the Demon License Agreement.  Third-Party Plaintiffs disagree.

38.     The obligation to pay royalties to Trax Artists whose music was exploited as part of the Demon License Agreement remains with Casablanca.  Third-Party Plaintiffs are not now,

9

and have never been, obligated to pay royalties to the Trax Artists including Heard and Owens under the Demon License Agreement because, among other reasons: (a) the Demon License Agreement was never assigned or transferred to Third-Party Plaintiffs, Cain, Sherman or Trax Records; (b) Third-Party Plaintiffs are not parties to, or third-party beneficiaries of, the Demon License Agreement; (c) Third-Party Plaintiffs did not receive any portion of the Advance; and (d) the Settlement Agreement makes clear that Trax Records, Cain, and Sherman expressly refused to assume any of Casablanca's debts or liabilities such as paying royalties to artists. (Ex. 1 ¶ 3.) For these reasons, among others, the Third-Party Plaintiffs are not now, and never have been, obligated to perform any of the obligations of Casablanca or Demon under the Demon License Agreement.

39.    Accordingly, Third-Party Plaintiffs request a declaratory judgment from this Court that: (a) Third-Party Plaintiffs are not obligated to pay royalties to artists whose music was exploited pursuant to the Demon License Agreement; and (b) Casablanca and/or Demon are obligated to pay all royalties to the Trax Artists whose music has been exploited as part of the Demon License Agreement.

40.    Third, Casablanca claims the Demon License Agreement is an existing and enforceable license. Third-Party Plaintiffs disagree. Because of the indefinite term and lack of certainty, the Demon Licensing Agreement is unenforceable under Illinois law and terminable under English law. (Ex. 1 ¶ 6 p. 4; ¶ 2 p. 2.) Accordingly, Third-Party Plaintiffs request a declaration that the Demon License Agreement is unenforceable.

41.    The Declaratory Judgment statute, 28 U.S.C. § 2201, provides in part:

In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201.

42. An actual controversy exists between Casablanca, on the one hand, and Third-Party Plaintiffs, on the other hand, concerning: (a) the right to enforce paragraph 12 of the Demon License Agreement against Third-Party Plaintiffs, (b) Casablanca's obligation to pay royalties to Trax Artists that were generated as a result of the exploitation of the Demon License Agreement, and (c) the existence and enforceability of the Demon License Agreement.

43. There exists a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of this controversy or some part thereof between the parties.

44. A declaratory judgment is likely to prevent or redress the ongoing controversy between the parties.

45. The Third-Party Plaintiffs do not have an adequate remedy at law to redress their dispute with Casablanca.

**WHEREFORE**, Third-Party Plaintiffs request that this Court:  (A) enter a declaratory judgment that (1) paragraph 12 of the Demon License Agreement is not enforceable against Third-Party Plaintiffs; (2) Third-Party Plaintiffs are not now, and never have been, obligated to pay royalties to artists whose music was exploited pursuant to the Demon License Agreement; (3) Casablanca and/or Demon are currently, and always have been, obligated to pay all royalties to the artists whose music has been exploited as part of the Demon License Agreement; and (4) the Demon License Agreement is not an existing or enforceable license agreement; and (B) enter any additional relief the Court deems just and proper.

## COUNT II
## BREACH OF THE SETTLEMENT AGREEMENT

46. Third-Party Plaintiffs reallege their allegations in paragraphs 1-31 as their allegations to this paragraph.

47. The Settlement Agreement and Assignment (Exhibit 2 hereto) is a binding and enforceable contract.

48. Casablanca materially breached the Settlement Agreement by failing to pay Trax Artists the royalties that they were allegedly due as a result of the Demon License Agreement.

49. Casablanca's breach has harmed Third-Party Plaintiffs because they have been forced to pay attorneys' fees and costs to defend against the claims in this case by Heard and Owens, Cain has not received royalty payments to which she was entitled, and the reputation of the Third-Party Plaintiffs in the industry has been harmed as a result of Casablanca's failure to pay royalties.

**WHEREFORE**, Third-Party Plaintiffs request that the Court: (1) enter judgment in their favor and against Casablanca in an amount exceeding $75,000 exclusive of interest and costs, attorneys, costs and expenses; and (2) grant any additional relief the Court deems just.

## COUNT III
## AN ACTION FOR AN ACCOUNTING

50. Third-Party Plaintiffs reallege their allegations in paragraphs 1-31 as their allegations to this paragraph.

51. Third-Party Plaintiffs are entitled to an accounting from Casablanca on behalf of each Trax Artist, including Cain, Heard and Owens because Third-Party Plaintiffs own or have specific rights in the music and each copyrighted work that Third-Party Defendant is and has been exploiting under the Demon License Agreement.

52. In addition, the Third-Party Plaintiffs are entitled to an equitable accounting of the revenues generated by Third-Party Defendant to adjust the accounts concerning the royalties owed to the Trax Artists. The revenue and profits generated as a result of the JVA and the Demon License Agreement is a one-sided account held exclusively by Casablanca to the exclusion of the

12

Trax Artists that is of a complicated nature that requires relief, by way of discovery, for their settlement. What revenues are subject to royalty payments, the amount of the royalty payments that are owed, and to whom the royalties are payable are complicated issues and are voluminous in nature.

53.     In addition, the Trax Artists do not know, and would have no way of knowing, the various mediums Demon and Casablanca used to exploit the Trax Catalogue, or the amounts recovered as a result thereof. The Trax Artists must place (and have placed) a significant level of trust in licensees such as Casablanca to properly and accurately account for revenues and royalties, which trust further warrants an accounting and additional discovery.

54.     Third-Party Plaintiffs do not have an adequate remedy at law to address Third-Party Defendant's failure and refusal to account for the profits, losses, and royalty payments that were received pursuant to the Demon License Agreement.

55.     To properly and sufficiently account for the royalties due and owing the Trax Artists and Third-Party Plaintiffs, they request appointment of a receiver in this case for the limited purpose of: (i) auditing the books and records of Casablanca from 2002 to date, (ii) providing the Court and Third-Party Plaintiffs with an accounting of revenues, expenses, profits, royalties due and owing and other financial information generated as a result of, or concerning, the Trax Music Catalogue, and (iii) collecting from Casablanca and/or Demon all royalty payments due and owing the Trax Artists and distributing all royalty payments to all Trax Artists.

**WHEREFORE**, Third-Party Plaintiffs requests that the Court: (1) enter judgment in their favor and against Casablanca for an accounting; (2) appoint a receiver for the purpose of auditing the books and records of Casablanca concerning revenue generated by the Trax Music Catalogue,

and paying third parties entitled to royalties as a result thereof as noted above; and (3) grant any additional relief the Court deems just.

## COUNT IV
## UNJUST ENRICHMENT

56.     Third-Party Plaintiffs reallege their allegations in paragraphs 1 -31 as their allegations to this paragraph.

57.     Neither Third-Party Plaintiffs nor the Trax Artists is a signatory to the Demon License Agreement.

58.     Casablanca and Demon have exploited the Trax Music Catalogue pursuant to the Demon License Agreement since 2007, collected revenues generated thereby, but failed to pay all alleged royalties due and owing to the Trax Artists whose music is subject to the Demon License Agreement.

59.     Casablanca has unjustly retained revenue and royalties due and owing to the Trax Artists including Heard and Owens to the detriment of Third-Party Plaintiffs and the Trax Artists.

60.     The retention of the revenue and royalties by Casablanca violates the fundamental principles of justice, equity, and good conscience.

61.     Third-Party Plaintiffs do not have an adequate remedy at law to compensate them or the Trax Artists for the Third-Party Defendant's wrongful conduct.

 **WHEREFORE**, the Third-Party Plaintiffs request that the Court: (1) enter judgment in their favor and against Third-Party Defendants in amount to be determined at trial but in no event less than $75,0000, plus costs, and attorneys' fees as an element of damages; (2) order an audit and accounting of the books and records of Casablanca of all revenue generated as a result of their exploitation of the Trax Music Catalogue and Demon License Agreement; and (3) grant any additional relief the Court deems just and proper.

**COUNT V**
**INJUNCTIVE RELIEF**

62.     Third-Party Plaintiffs reallege their allegations in paragraphs 1-31 as their allegations to this paragraph.

63.     Third-Party Plaintiffs are entitled to an injunction ordering Third-Party Defendant to cease all licensing of the Trax Music Catalogue and Master Recordings under the Demon License Agreement.

64.     Plaintiffs have a clearly ascertainable right in need of protection because they own the Trax Music Catalogue and all rights and interests therein, the Third-Party Plaintiffs have the right to license the Trax Catalogue free from unlawful interference from Third-Party Defendant in the form of their failure and refusal to pay Trax Artists royalties.

65.     Third-Party Plaintiffs do not have an adequate remedy at law because no monetary award can provide them with a complete, clear, practical and efficient remedy to stop the continued and unauthorized exploitation of the Trax Catalogue by Demon and Casablanca and their refusal and failure to pay royalties to Trax Artists.

66.     Third-Party Plaintiffs have a likelihood of success on the merits of their claims.

67.     The balance of harms favors Third-Party Plaintiffs and the Trax Artists because they are suffering immeasurable harm as a result of the wrongful conduct by the Third-Party Defendant.

**WHEREFORE**, Plaintiff respectfully prays that the Court grant the following relief: (1) A temporary, preliminary and permanent injunction prohibiting Third-Party Defendant, its agents, servants, employees and/or all persons acting in concert or participation with them, or any of them, from continuing to use the Demon License Agreement for any purpose;  (2)  an order compelling Third-Party Defendant to account for all revenue, losses, profits and royalties

15

generated by the exploitation of the Trax Music Catalogue; and (3) All other relief to which Third-Party Plaintiffs are entitled.

DATED: July 21, 2021

**TRAX RECORDS INC. AND RACHAEL CAIN**

BY: _____

_____
One of their Attorneys

Richard P. Darke
Duane Morris LLP
190 S. LaSalle Street, Suite 3700
Chicago, IL 60601
(312) 499-6700
rpdarke@duanemorris.com
rciambrone@duanemorris.com

CASABLANCA TRAX INC.

- and -

DEMON MUSIC GROUP LIMITED

---

LICENCE AGREEMENT

---

**THIS AGREEMENT** is made the  31ST  day of  October  2007

BETWEEN:-

(1)　**CASABLANCA TRAX INC.** of 365 Bloor Street East, Suite 1610, Toronto, Ontario, Canada, M4W 3L4 ("the Owner")

(2)　**DEMON MUSIC GROUP LIMITED** of 33 Foley Street, London, W1W 7TL ("the Licensee")

In consideration of the Advance and the Royalties, the Owner grants to the Licensee the Rights in the Masters upon the terms and subject to the conditions of this Agreement.

1　**The Masters**

The Masters shall be those master recordings performed by Artist owned and/or controlled by Owner and specifically referred in Schedule 2.

2.　**The Advance**

The Advance shall subject to Clause 10 be Seven Hundred Thousand dollars ($700,000) which sum shall be payable as to:

i)　Three Hundred and Fifty Thousand U.S Dollars (US$350,000) ("the First Instalment") upon full execution of this Agreement; and

ii)　One Hundred Thousand US Dollars (US$100,000) ("the Second Instalment") six months from the date that this Agreement is fully executed;

iii)　One Hundred and Fifty Thousand U.S Dollars (US$150,000) ("the Third Instalment") upon the sooner of the date of recoupment of the First Instalment and the Second Instalment from the Royalty or the date three years from the date of this Agreement;

iv)　One Hundred Thousand U.S Dollars (US$100,000) ("the Fourth Instalment") upon the sooner of the date of recoupment of the First Instalment and the Second Instalment and the Third Instalment from the Royalty or the date five years from the date of this Agreement

3.　**The Delivery Date**

casablanca trax licence 2007 signature copy 311007.doc

2

Masters as required by Licensee.

4.    **Exclusivity**

The Rights shall be sole and exclusive in the Territory. The Licensee acknowledges the Existing Agreements listed in Schedule 3. Save where instructed by Licensee in writing Owner agrees to use its best endeavours to ensure the expiry and/or termination of the Existing Agreements as soon as practicable in accordance with the terms of the same. Owner warrant that the details given in Schedule 3 as to the terms of the Existing Agreements are accurate and complete.

5.    **Royalty Rate**

The Royalty Rate shall be as follows:-

(a)    In respect of Records/DEMD released on Licensee owned and/or Licensee controlled labels Eighteen percent (18%) of the Net Dealer Price for Records or DEMD on one hundred per cent (100%) of Net Sales;

(b)    Twenty percent (20%) of Net Receipts or 20% of flat fee income earned in relation to sub-licensing the Masters (or any of them) by the Licensee to a bona fide third party on arms length terms;

(c)    Twenty percent (20%) of Net Receipts:

i)    in relation to exploitation of the Masters in synchronisation with audio or visual works or to use such Masters or part or parts thereof in motion picture or television soundtracks;

ii)    sales of Records as premiums or in connection with the sale of any other product, commodity or service;

iii)    generally any exploitation of the Masters by any means not specified in Paragraph 5 of the Principal Terms.

(d)    To the extent that catalogue numbers relating to the Records released by the Licensee and any third party authorised by the Licensee are registerable the Licensee shall be entitled to retain Eighty percent (80%) of all fees of the record company's share from broadcasting and public performance of the Masters when such fees identifiably arise from broadcasting or public performance of the Records. The Owner hereby authorises the Licensee to collect all broadcasting and public performance fees as defined in this clause arising from its use of the Masters and to account to the Owner in respect of the Owner's share;

The Term shall be the longer of a period of Ten (10) years commencing on 1st ~~October~~ November *JM*
2007 or Three (3) years from the date the Licensee recoups the Advance (including
the First Instalment, the Second Instalment and the Third Instalment) from the
Royalty.

7.  **The Territory**

    The World

8.  **Credit and Copyright Notice**

    Each Record shall bear the following notices:-

    TBC

9.  **General Terms and Conditions**

    This agreement shall be governed by the General Terms and Conditions set out in
    Schedule 1

10.  **Loss of Rights**

10.1  Without prejudice to Licensee's other rights and remedies under the terms of this
      Agreement in the event that during the Term the Owner does not for any reason have
      ownership and/or control of any of the Masters by the Artists listed below:

(a)  the Advance shall be reduced by the percentages indicated. Any subsequent
     instalments of the Advance becoming due shall be reduced by such percentages:

| Artist | Percentage Reduction In Advance |
| --- | --- |
|  | 15% |
| REDACTED | 12% |
|  | 15% |
| Mr. Fingers | 15% |
|  | 5% |
|  | 5% |
| REDACTED | 5% |
|  | 5% |
|  |  |

(b)  For the avoidance of doubt the foregoing percentage reductions to the Advance shall if
     applicable be cumulative in effect so that in the event that Masters by more than one
     of the Artists listed above are no longer controlled by Owner the reduction in the
     Advance shall be the aggregate of the percentages stated in relation to each such

casablanca trax licence 2007 signature copy 311007.doc

4

10.2   In addition to the reduction in the Advance as described in 10.1 above a sum equal to:

(the Applicable Percentage multiplied by the amount of Advance already paid) multiplied by a fraction the numerator of which shall be the number of years of the Term that remain unexpired and the denominator of which shall be 10.

shall be repaid by the Owner to the Licensee on demand and may at Licensee's discretion be deducted from any subsequent Advance payments.

10.3   By way of example only, in the event that there was an Applicable Percentage of 10% at end of the third year of the Term the following would apply:

(a)   In accordance with the 10.1 above the Third Instalment would be reduced to US$135,000 and the Fourth Instalment would be reduced to US$90,000; and

(b)   In accordance with 10.2 Owner would repay to Licensee the sum of US$31,500 calculated as follows:

(US$450,000 x 10%) = US$45,000 divided by 7/10 = US$31,500

10.4   The reduction in the Advance payable in accordance with 10.1 and the repayment in accordance 10.2 shall be pro-rated by multiplying the otherwise applicable sum by a fraction the numerator of which shall be the number of Masters no longer owned or controlled by Owner and the denominator of which shall be the total number of Masters by the applicable Artist originally contemplated by this Agreement provided always that notwithstanding the foregoing if any of the Masters no longer owned and/or controlled by the Owner is any of the Masters listed in Schedule 4 the reduction in the Advance under 10.1 and the repayment under 10.2 shall not be pro-rated.

10.5   In the event that an Artist or other third party alleges that the Owner does not own certain Masters or an Artist (or Artist's representative) purports to terminate the Owner's rights in any Masters the Owner shall have a period of 60 days commencing on the date of such allegation to settle the matter with the Artist in writing and to establish Owner's ownership of the relevant Masters. If Owner does not settle the matter and establish its ownership as aforesaid the Owner shall have a further period of 30 days to commence formal legal proceedings against the claimant failing which the provisions of clauses 10.1 and 10.2 above shall apply. The Licensee shall not be obliged to pay any Advance payments or royalties during the aforesaid 60 and 30 day periods.

10.6   If formal legal proceedings are commenced against the claimant within the aforesaid 30 day period the payment of royalties and instalments of the Advance shall be

apply

10.7  For the avoidance of doubt in the event that the Owner's rights expire by virtue of the passage of time the foregoing 30 day period shall not apply and the provisions of clauses 10.1 and 10.2 shall apply upon the expiry of the initial 60 day period.

10.8  Licensee shall notify Owner in writing of any claims that would adversely affect Owner under this section 10

## 11.  Controlled Compositions

In respect of the United States and Canada each Controlled composition shall be licensed to Licensee for Records and DEMD released on Licensee owned and/or controlled labels at a copyright royalty rate of seventy-five percent (75%) of the minimum statutory rate in force at the date of release of said Record or DEMD

For the purposes of this Agreement "Controlled Composition" shall mean a musical work embodied on a Master which musical work is directly or indirectly owned or controlled by Owner

## 12.  Option To Purchase

For a period of ninety (90) days ("the Option Period") following the expiry of the Term the Licensee shall have the exclusive option (but not the obligation) to purchase from Owner the full copyright and all other rights in the Masters in perpetuity throughout the World for One Hundred and Fifty Thousand U.S dollars (US$150,000) ("the Purchase Option"). In the event that Licensee wishes to exercise the Purchase Option it shall inform Owner in writing ("the Option Notice") at any time during the Option Period and Owner shall execute such documentation as reasonably required by Licensee in order to effect the purchase which both parties shall use all reasonable endeavours to complete within 90 days from the date of the Option Notice.

## 13.  Special Conditions

13.1  As of the date of this Agreement the Licence Agreement between Owner and Licensee dated [          ] shall be deemed to be terminated.

13.2  Owner agrees to instruct the licensee's in relation to the Existing Licenses to account all revenues payable in respect of such licences to Licensee with effect from the date of this Agreement.

casablanca trax licence 2007 signature copy 311007.doc



6

# GENERAL TERMS AND CONDITIONS

1. **DEFINITIONS**

(1)  In this Agreement the following words and expressions shall unless the context otherwise requires have the following meanings:-

**"the Advance"**

The sum referred to in Paragraph 2 of the Principal Terms which shall be fully recoupable from royalties otherwise payable to the Owner hereunder;

**"the Agreement"**

means the Agreement of which this Schedule forms part;

**"the Artist"**

the performing artist(s) referred to in Schedule 2 ;

**"the Delivery Date"**

the date specified in Paragraph 3 of the Principal Terms for delivery of the Delivery Materials;

**"Delivery Materials"**

One fully digital master recording tapes or compact discs of each of the Masters (or such other format as may be acceptable to Licensee) (as selected and ordered by the Licensee) of best available quality for use in the commercial production of records for general sale together with label copy detailing the correct title of each recorded musical or other work embodied on each of the Masters, the names of the author, composer and publisher thereof together with any additional copyright information known to the Owner and such promotional material as is available to the Owner.

**"Digital Electronic Music Distribution" or "DEMD"**

any transmission, distribution, dissemination or making available of Masters (or the digitised contents thereof) by any means now or hereafter known including but not limited to transmission, distribution, dissemination or making available via telephone, satellite, broadcast, wireless, cable and/or the internet whether or not a direct or

**"Licence Period"**

In respect of each Record and/or DEMD released by Licensee or its sub-licensees during the Term hereof on Licensee owned and/or controlled labels means the Term provided that in the case of Records/DEMD released in the final two (2) years of the Term only the Licence Period shall be three (3) years commencing on the date of the first release of each such Record/DEMD.

In respect of any synchronisation license issued for a term of perpetuity in respect of a film or television programme issued by Licensee to any bona fide third party as permitted pursuant to the terms hereof, the life of copyright in and to the Masters.

**"Masters"**

the original master sound recordings listed in Schedule 2 embodying the Artist's performances;

**"Net Dealer Price"**

the usual or published dealer prices at which the Licensee offers Records and DEMD for sale to the retail trade from time to time less any discount that the Licensee may grant for any purpose and excluding any value added tax or other taxes duties or levies imposed from the inception of production through to final sale of the Records

**"Net Receipts"**

all sums actually received by or credited to the Licensee from its exploitation of the Masters granted pursuant to this Agreement after the deductions of credits for actual returns, taxes, duties.

**"Net Sales"**

means Records Sold and DEMD paid for and which are not returned or credited;

**"Principal Terms"**

means the terms set out in the agreement to which this Schedule is annexed;

**"Records"**

Sound Carriers embodying the Masters or any part thereof with or without other

**"Records Sold"**

means Records sold and paid for which are not returned or credited;

**"the Royalty Rate"**

the royalty rates specified in Paragraph 5 of the Principal Terms;

**"Sound Carriers"**

includes vinyl records, cassettes and compact discs and any other device or contrivance of any type character or description whether now or hereafter known for the reproduction of sound alone;

**"Term"**

the period referred to in Paragraph 6 of the Principal Terms;

**"Territory"**

the geographical territory referred to in Paragraph 7 of the Principal Terms.

(2)    Words denoting the singular shall include the plural and vice versa. Words denoting any gender shall include all genders. Words denoting persons shall include corporations and vice versa.

(3)    References to Clauses are to clauses and sub-clauses of these General Terms and Conditions and references to Paragraphs are to the paragraphs of the Principal Terms of this Agreement.

(4)    For the purposes of this Agreement "subsidiary" and "holding company" shall have the same meaning as in S736 of the Companies Act 1985.

2.    **LICENCE OF MASTERS**

The Owner with full title guarantee hereby grants by way of licence to the Licensee and the Licensee hereby accepts from the Owner upon the terms of this Agreement the following rights ("the Rights") during the Term for exploitation in the Territory in each instance during the Term or in the applicable Licence Period:-

otherwise market and exploit in all media (including without limitation the internet) the Masters and any part thereof and the Artist's performances embodied thereon and Records derived therefrom and by means of DEMD in the Territory both separately and in combination with any other material and under any label, trademark or other identification;

(b)     the right to use and publish in the Territory the name, likeness and biography of each Artist whose performance is embodied on the Masters in connection with the packaging, advertising, publicising or sale of Records and DEMD

(c)     subject to the rights of any performing right society to authorise throughout the Territory public performances, the playing in public, broadcast, inclusion in a cable programme service or any other form of transmission of the Masters by telecommunications system or by wireless telegraphy of Records and DEMD for the purpose of exploiting the same (for the avoidance of doubt nothing herein shall be deemed to include permission in relation to the relevant musical compositions);

(d)     The right to authorise others (whether by sub-licence or otherwise) to exercise any of the rights set out in (a)-(c) above upon bona fide arms length terms.


## 3.     ADVANCES AND ROYALTIES

(1)     In consideration of the grant of the Rights and provided that the Owner shall have fully complied with its material obligations hereunder the Licensee agrees to pay to the Owner:-

(a)     the Advance (subject to Clause 10 of the Special Conditions)

(b)     save as otherwise provided for in this Clause 3, subject to recoupment in full of the Advance the Royalty on one hundred per cent (100%) of all Records Sold and DEMD, paid for in full and not returned

(c)     the other amounts specified in Paragraph 5 of the Principal Terms.

(2)     If Records Sold and/or DEMD contain Masters or any part thereof together with other masters then the sum payable to the Owner on any such Record/DEMD shall be based on that fraction of the applicable Royalty Rate as the number of tracks embodying Masters contained in such Record bears to the total number of tracks.

(3)     In respect of Records Sold / DEMD:-

(a)     as any multiple record set consisting of two or more Records packaged together as a unit where the published dealer price is less than two-thirds of the

    (b)    as television advertised albums;

    (c)    through record clubs, direct mail order operations or similar sales plans or devices

    (d)    other than through retail stores or other regular distribution channels including, without limitation, Records sold as premiums or in connection with the sale of any other product, commodity or service;

    (e)    at a discount to wholesalers and/or rack jobbers and/or any other trading group receiving special discounts where the discount is at least 20%;

the royalty rate shall be fifty per cent (50%) of the Royalty Rate.

(4)    No royalties shall be paid on:-

    (a)    Records in numbers consistent with normal industry practice given away or sold at less than the cost to the Licensee therefor for promotional purposes or to induce sales of Records hereunder;

    (b)    Records distributed as "bonus" or "free" Records through record clubs or mail-order;

    (c)    Records sold as "cut-outs" deletions or scrap;

provided that in no event shall the aggregate number of Records referenced above exceed 10% of the total number of Records manufactured hereunder.

## 4.    ROYALTIES AND ROYALTY ACCOUNTING

(1)    The Licensee shall calculate royalties accruing to the Owner pursuant to Clause 3 twice yearly as of 31st March 30th June 30th September and 31st December for each preceding three (3) month period during which Records and DEMD derived from the Masters are sold and will render a statement setting out in reasonable detail the calculation of the amount thereof and pay such royalties less any sales taxes and any unrecouped Advance within sixty (60) days of the applicable date.

(2)    Within 2 years after any royalty statement is delivered to the Owner in accordance with Clause 4(1) but not more than once per year and once after the expiry of the Term, the Owner shall have the right to give reasonable notice that it wishes to inspect the books and records of the Licensee insofar as the said books and records pertain to such statement. Such inspection shall be carried out at the Owner's expense by independent qualified accountants chosen by the Owner provided always that such firm of accountants is not thus carrying out an examination of the Licensee's books on

tolled until such engagement is completed. Such inspection shall be commenced within thirty (30) days of the date of the written notice during normal business hours on normal business days at the place where the Licensee keeps the books and records which relate to this Agreement. The said accountants shall covenant with the Licensee to keep confidential all such books and records and any other information obtained from any employee of the Licensee and only to use information acquired therefrom for the purposes specified in this Clause 4(2). In the event that the said inspection identifies a shortfall of the royalties paid in respect of the relevant period the Licensee shall forthwith pay such sum to the Owner, together with interest calculated at 2% above the Owner's Bank base rate from the date such payment should have been made together and if such shortfall exceeds five percent (5%) or one thousand pounds (£1,000), whichever is greater, Licensee shall reimburse Owner with the reasonable costs of the audit (excluding accommodation and subsistence costs). Unless notice shall have been given to the Licensee as provided in this Clause each royalty statement rendered to the Owner shall be final conclusive and binding on the Owner and shall constitute an account stated.

(3)     The Licensee shall be entitled to retain in each accounting period a sum not exceeding twenty five per cent (25%) of the Royalties otherwise payable to the Owner as a reserve against returns applicable and limited only to Records /DEMD released on Licensee owned and/or controlled labels.   Each reserve shall be released within the next four (4) accounting periods following the accounting period in which the reserve was made.

(4)     Royalties shall be calculated in the national currency in which the Licensee is paid and shall be paid to the Owner at the rate of exchange prevailing on the date on which the payments are due to the Owner.

## 5.     DUTIES OF THE LICENSEE

(1)     The Licensee warrants and represents to the Owner that it has full right, power and authority to enter into and perform this agreement.

(2)     The Licensee agrees with the Owner:-

   (a)     not to release Records/DEMD otherwise than in accordance with the provisions of this Agreement;

   (b)     to deliver free of cost to the Owner five (5) copies of each Record released by it in the form and packaging as generally released together with any applicable advertising or promotional materials.  No royalty shall be payable on such copies;

   (c)     not to copy or duplicate the whole or any part of the Masters otherwise than for the purpose of this Agreement;

manufacture and sale of Records hereunder (and DEMD equivalent) in respect of any element of copyright musical compositions and other material contained in the Records/DEMD;

(e) to incorporate on the packaging of each Record a copyright notice and credit to the Owner in the form set out in Paragraph 8 of the Principal Terms.

(f) that it will obtain Owner's prior written consent prior to editing and/or re-mixing any of the Masters such consent not to be unreasonably withheld or delayed and to be deemed given unless written notice denying permission, stating the reason for objection, is served on the Licensee by the Owner within five (5) business days of the Owner's receipt of Licensee's request for permission.

(2) The Licensee agrees to indemnify and keep indemnified the Owner against any and all liability, loss, damage, cost or expense paid or incurred by reason of any breach of any of the Licensee's obligations hereunder provided always that such sums arise pursuant to a final, non-appealable court order or settlement made with Licensee's prior written consent such consent not to be unreasonably withheld or delayed.

## 6. DUTIES OF OWNER

(1) The Licensee acknowledges that it has received certain Delivery Materials prior to the date hereof. In the event that Licensee requires further Delivery Materials the Owner shall use its best endeavours to acquire such materials and Deliver the same to the Licensee. The Licensee shall have the right to reject the additional Delivery Materials if they are not in the Licensee's reasonable opinion of a suitable technical quality for the manufacture of Records hereunder. The Licensee shall exercise its right of rejection within fourteen (14) days of receipt of the additional Delivery Materials, in default of which the Licensee shall be deemed to have accepted them. In the event that the Licensee rejects the additional Delivery Materials, the Licensee may, at its election and without prejudice to any other right and remedies whether contained herein or otherwise, request such additional Delivery Materials to be re-supplied on such reasonable conditions as it may impose.

(2) The Owner warrants, undertakes and agrees with the Licensee that:-

(a) to the extent that Owner owns or controls the relevant rights in the musical compositions embodied on the Masters the Licensee will be able to acquire without delay a mechanical reproduction licence and DEMD equivalent on the terms and conditions and at the royalty rate generally prevailing in the Territory in respect of all copyright musical compositions and other material recorded on the Masters owned and/or controlled by the Owner to enable the Licensee to exploit such material and the Masters embodying the same as

(b)     all consents required for the exploitation of the Masters and the Delivery Materials including, without limitation, any Artist consents required by law have been obtained by the Owner and the benefit of such consents extends to the Licensee and to any third party authorised by the Licensee to exercise any of the Rights in accordance with the terms and conditions of this Agreement;

(c)     all necessary permissions for the recording of, the reproduction of and the licensing to the Licensee of the Masters and any other element of the Delivery Materials have been obtained by the Owner;

(d)     the Owner shall pay all costs expended or incurred by the Owner with respect to the production of the Masters and all sums payable under any agreement between the Owner and any parties connected with the production of the Masters including without limitation the Artist or any of them whose services or performances are embodied on the Masters and payable as a result of the manufacture, sale, rental, lending of Records and any other form of exploitation of the Masters;

(e)     intentionally deleted;

(f)     the exercise by the Licensee of the Rights shall not infringe any rights of any third party or in any way contravene any applicable statute, law, order, rule or regulation;

(g)     the additional Masters delivered hereunder shall be technically satisfactory for the purposes of the manufacture of Records hereunder;

(h)     the Owner is fully empowered to enter into this Agreement and to grant the Rights and shall not hereafter grant or in any way encumber the same so as to derogate from the grant made hereunder.

(i)     save in respect of the master tapes held in storage in Chicago as of the date of this Agreement ("the Chicago Tapes") it has delivered all Masters in its possession and Owner shall deliver to Licensee any other Master that subsequently come into Owners' possession. Owner shall deliver the Detroit Tapes to Licensee within Thirty days of the date of this Agreement. In the event that the Owner does not deliver a Master by the Delivery Date referred to herein the Licensee shall be entitled at the Owner's cost to create a duplicate Master from any and all masters stored by the Licensee on behalf of the Owner. Such cost shall at the Licensee's discretion be either paid by the Licensee and be recoupable from monies otherwise payable to the Owner pursuant to this Agreement or be paid by the Owner.

(j)     if any of the Owner's rights in the Masters expire or are terminated for

casablanca trax licence 2007 signature copy 311007.doc

all of the Rights granted to Licensee hereunder for the remainder of the Term.

(3) The Owner agrees to indemnify and keep indemnified the Licensee against any and all liability, loss, damage, cost or expense (including reasonable legal fees) paid or incurred by reason of any breach or alleged breach of any of the Owner's covenants, warranties, representations or agreements herein contained. The Licensee that it shall immediately notify Owner in writing of any action which might give rise to a claim hereunder. In the event that Owner advises Licensee in writing that it shall not take any action to resolve an action or claim the Licensee shall be entitled to defend, settle, compromise and otherwise prosecute any action which might give rise to a claim hereunder and the Owner shall provide to the Licensee such assistance and documents as the Licensee may reasonably require in relation thereto provided that in such circumstances the Owner's indemnification of Licensee hereunder shall remain in full force and effect. If the Licensee has any claim against the Owner arising out of any breach or alleged breach of any of the Owner's covenants, warranties, representations or agreements then the Licensee shall be entitled to withhold from any royalties otherwise due to the Owner hereunder an amount reasonably sufficient to meet such claim which amount shall be paid out to the Owner within 6 months if no proceedings have been issued by that time.

## 7. PROMOTIONAL AND PACKAGING MATERIALS

The Licensee shall be responsible for the creation of cover designs, packaging designs and any other artwork including any and all advertising and publicity material relating to Records and any such artwork and any and all rights of whatsoever nature (including, without limitation, any copyright and similar rights) therein shall become and remain the sole property of the Licensee. The Owner hereby grants to the Licensee the non-exclusive license for the Term and in the Territory to use Owner's logos and trademarks in connection with the manufacture, packaging, promotion, publicity and advertising of Records.

## 8. OWNERSHIP OF LICENSED PROPERTY

All Delivery Materials shall remain the sole and exclusive property of the Owner subject only to the rights of the Licensee under this Agreement.

## 9. INTENTIONALLY DELETED

## 10. DEFAULT

Either party hereto shall be entitled, by giving not less than ten (10) days written notice to the other party, to terminate this Agreement without prejudice to such accrued rights or claims as the terminating party may have against the other party if such other party is in breach of any of its material obligations hereunder and such breach is not cured within thirty (30) days after written notice to that party.

casablanca trax licence 2007 signature copy 311007.doc

strategy in the Territory, it shall notify the Owner in writing. The Owner shall forthwith on receipt of such notice take such action as is reasonable (if any) (excluding legal action) to prevent such unauthorised use and the Licensee shall co-operate with the Owner in any such action.

14. **CONFIDENTIALITY**

Each party shall keep confidential and shall not disclose to any third parties (other than professional advisers and the Court) and in the case of the Owner its licensor where necessary) the terms of this Agreement or any matters relating or incidental to this Agreement or to the business of the other party

15. **FORCE MAJEURE**

Notwithstanding anything contained in this Agreement in the event of this Agreement being rendered wholly or partially impossible of performance by either party for any reason beyond its reasonable control (including but not limited to war invasion act of foreign enemy hostilities where war be declared or not civil war or strife rebellion strikes lock-outs or other industrial disputes or actions or acts of God or acts of government) then such non-performance shall not be deemed to constitute a breach of this Agreement. The Term shall be extended by the period of force majeure provided that no extension shall exceed 12 months. If any force majeure event delays or prevents performance of this Agreement for a period exceeding twelve (12) months, either party may elect to terminate this agreement upon written notice to the other party.

16. **SEVERABILITY**

If any provision of this Agreement shall be prohibited by or adjudged by a court to be unlawful void or unenforceable the same shall to the extent required be severed from this Agreement and rendered ineffective so far as is possible without modifying the remaining provisions of this Agreement and shall in no way affect any other circumstances or the validity or enforceability hereof.

17. **ENTIRE AGREEMENT**

This Agreement contains the entire agreement of the parties in respect of the subject matter hereof and replaces and supersedes all prior arrangements, understandings, representations and agreements in respect of this subject matter. In the event of any conflict between the provisions of the Principal Terms and the provisions of these General Terms and Conditions, the provisions of the Principal Terms shall prevail. This Agreement may not be modified orally and no waiver, amendment or modification shall be binding or effective unless in writing and signed by both parties.

casablanca trax licence 2007 signature copy 311007.doc

17

18. **CLAUSE HEADINGS**

The clause headings used herein are for convenience only and shall not affect the construction hereof.

19. **NOTICES**

(1) All communications between the parties with respect to any of the provisions of this Agreement shall be addressed to the person set out below, sent to the addresses set out at the head of this Agreement or to such other addresses as may be duly notified by the parties by pre-paid registered or recorded delivery post or by facsimile transmission or other electronic means of written communication with confirmation by letter given by the close of business on the next following business day.

(2) Communications which are sent or despatched as set out below shall be deemed to have been received by the addressee as follows:-

(a) if despatched by post, five (5) days after despatch or, if despatched by telex, facsimile transmission or other electronic means of written communication during the business day of the addressee the next following the day on which the communication was sent;

(b) Addressee in the case of the Owner:-
FAO: Edmund Glinert

Addressee in the case of the Licensee-
FAO: The Company Secretary

(3) In proving service by post it shall only be necessary to prove that the communication was contained in an envelope which was duly addressed, stamped and posted by registered or recorded delivery post  In proving service by facsimile transmission or other electronic means of written communication, proof of service will be accepted on proof of receipt of the correct answerback code or other equivalent confirmation of receipt.

(4) For the purpose of this Clause a "business day" means a day on which the clearing banks in the City of London are open for business.

20. **APPLICABLE LAW**

This agreement shall be governed by and construed in accordance with English law and the parties hereby submit to the exclusive jurisdiction of the English Courts in connection with any dispute arising hereunder.

casablanca trax licence 2007 signature copy 311007.doc

18

21. **THIRD PARTIES**

No person who is not a party to this Agreement shall have the right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms

22. **ASSIGNMENT**

The Licensee shall be entitled to assign this Agreement to any parent, subsidiary, associated or affiliated company or to any person firm or corporation acquiring all or a substantial part of its stock or assets provided that such assignee agrees to observe and perform Licensee's obligations pursuant to this Agreement from the effective date of such assignment.

23. **SPECIAL PROVISIONS**

None.

**AS WITNESS** the hands of the duly authorised representatives of the parties hereto the day and the year first before written

**SIGNED** by

for and on behalf of
**THE OWNER**
in the presence of:-

Jennifer Mitchell )

Edmund Olmert )

**SIGNED** by

for and on behalf of
**THE LICENSEE**
in the presence of:-

SCHEDULE 4



| | |
|---|---|
| Bring Down The Walls | Mr. Fingers |
| Can You Feel It (The Original Instrumental) | Mr. Fingers |
| Can You Feel It (Vocal) | Mr. Fingers |

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

This Settlement Agreement and Mutual General Release (the "Settlement Agreement") is made and entered into this ___9th___ day of ___November___, 2012, by and between Casablanca Trax Inc., as general partner of the Casablanca Trax Limited Partnership, a province of Ontario corporation ("Casablanca") on the one hand, and Trax Records, Inc.; Saber Records, Inc. and the following divisions thereof: Sanlar Publishing, Hot Mix 5 Records, Housetime Records, Dangerous Records, Demand Records, MAAD Records; Trax Continental Ltd.; Phat Trax, a division of R&L Records, Inc.; Phat Trax 2; R&L Records, Inc.; R&L Publishing, Inc.; Precision Record Labs, Ltd., a division of Trax Records, Inc.; Scream Diva Records; Rachael Cain, individually, Larry Sherman, individually (collectively, "Trax"). Casablanca and Trax shall herein collectively be the "Parties" and individually a "Party."

### RECITALS

A.     WHEREAS, in December, 2003, the Parties each executed that certain Joint Venture Agreement, as amended, (the "JVA") together with a Loan Agreement and General Security Agreement (collectively referred to as the "JV Documents"), evidencing certain loans by Casablanca to Trax as provided therein, and further evidencing the pledge of all of Trax's right, title and interest in and to all assets and rights owned or controlled by Trax (hereinafter referred to as the "Trax Catalogue") to secure said loans and agreements.

B.     WHEREAS, disputes arose between the Parties regarding Trax's performance of its obligations under the JVA and the Loan Agreement, and Casablanca filed that certain Verified Complaint for Replevin in May, 2005 as *Casablanca Trax LP v. Trax Records, Inc., et al*, 05 L 50499 (the "Lawsuit"). Following the replevin of certain of Trax' personal property, Casablanca advertised and held a UCC Sale of all of the Trax property pledged as collateral for

the loans. Thereafter, Trax filed an appeal of the judgment order (the "Appeal"), and in June, 2008, the First District Appellate Court reversed the money judgment in favor of Casablanca and directed the Parties to arbitrate the dispute. Trax filed its demand for Arbitration in January, 2009 (the "Arbitration"), Casablanca filed its counterclaim, and the Parties selected their panel of arbitrators. Prior to any substantive hearings, Trax was unable and Casablanca refused to make certain deposits of funds, and the Arbitration was suspended, then terminated on March 11, 2011. Subsequently, Trax sought additional relief in the Circuit Court of Cook County, which relief was granted in part and denied in part on August 21, 2012. (The Lawsuit, the Appeal, the Arbitration, and the subsequent pleadings are all, collectively, the "Litigation.")

      C.     The Parties, following good-faith and arm's length settlement discussions, now desire to enter into this Settlement Agreement in order to provide for the full settlement and discharge of all claims, known or unknown, that the Parties now have, or could have in the future, or might have had, which were made or could have been made, in the Litigation, and pursuant to the terms hereof.

## AGREEMENT

      1.     Incorporation of Recitals. The Recitals above are incorporated herein.

      2.     Assignment.   In connection with the Settlement agreement, Casablanca shall assign to Trax all its right, title and interest in the Trax Catalogue acquired pursuant to the JVA, as amended, and the UCC Sale. This assignment is evidenced by the Non-Recourse Assignment, attached as Exhibit A hereto, and Casablanca's assignment is as-is, where is, with all faults, subject to all existing licenses and agreements, and without recourse of any kind. Nothing herein shall be construed as providing for Trax's assumption of any debts or liabilities of Casablanca.

Release and Discharge of All Claims.   In consideration of the mutual promises set forth herein, the receipt and sufficiency of which are hereby specifically acknowledged by each of the parties, the Parties, each for themselves individually and on behalf of the past, present, and future officers, directors, shareholders, members, partners, subsidiaries, affiliates, agents, servants, employees, representatives, predecessors, successors, attorneys, heirs, executors, and assigns, do hereby completely and forever remise, release, acquit and forever discharge each other from any and all past, present or future claims, demands, obligations, actions, causes of action, rights, damages, costs, losses, recovery, which either Party has or may have had, one against the other, at any time prior to and including the date of the execution of this Settlement Agreement and Mutual Release, or arising in the future in connection with the Litigation or the JV Documents, including, without limitation, all matters and amounts referred to in the Litigation, as well as any and all known or unknown claims whether arising from contract (written or oral), tort, *quantum meruit* or other theory of recovery by either Party against the other, arising from any claim made or which could have been made in the Litigation.  This release, on the part of each of Casablanca and of Trax, shall be a fully binding and complete settlement between the Parties, who further agree that this Settlement Agreement and Mutual Release contains the entire agreement between the Parties hereto, and that the terms of this Settlement Agreement and Mutual Release are contractual and not mere recitals. Each Party further covenants to initiate no other litigation or claim of any kind, against the other Party, or against any entity or person substantially related to such other Party, as a result of any facts or matters which are the subject of the Litigation or the releases embodied herein.

4.    Dismissal of Litigation.  In connection herewith, the Parties shall jointly execute an Agreed Order of Dismissal with Prejudice, and shall promptly present it for entry to the

Circuit Court of Cook County, each party to bear its own costs. This settlement is a compromise of a disputed claim, and the Assignment is not to be construed as an admission of liability on the part of either Party, by whom liability is expressly denied.

5.    Attorney's Fees/Costs.    Each Party hereto shall bear all attorney's fees and costs arising from their or its own actions, the actions of their or its own counsel, in connection with the Litigation, this Settlement Agreement, and the matters and documents herein, and all other related matters.

6.    Representation of Comprehension of Settlement Agreement.    In entering into this Settlement Agreement, the Parties represent and warrant that they have relied upon the advice of their respective attorneys, who are the attorneys of their own choice, concerning the legal consequences of this Settlement Agreement; that the terms of this Settlement Agreement have been completely read and explained to the parties by their respective attorneys; that the terms of this Settlement Agreement are fully understood and voluntarily accepted by the Parties; and that they sign this Agreement/Release as a free and voluntary act.

7.    Warranty of Capacity to Execute Settlement Agreement.    The Parties represent and warrant that each has the sole right and exclusive authority to enter into this Agreement, and that the individual person executing this Agreement on their behalf has all proper authorization to do so and no further action or authorization is necessary to fully bind the Parties. The Parties further warrant that except as provided in the Assignment, no other person or entity has any interest in the claims, demands, obligations, or causes of action referred to in this Settlement Agreement, and that the Parties have not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Settlement Agreement.

8.     Governing Law and Interpretation of Settlement Agreement. This Settlement Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois. In the event this Settlement Agreement is interpreted by any Court, arbitration panel, mediator, or any other entity, individual, or body, neither of the Parties shall be deemed or considered the drafter of this Settlement Agreement. If any dispute arises with respect to the performance of obligations set forth in this Settlement Agreement, the Parties consent to the personal jurisdiction of any court in Chicago, Illinois for the resolution of the dispute.

9.     Terms of Agreement Interdependent. It is further agreed by the Parties that all portions and sections of this Settlement Agreement are interdependent and necessary to the voluntary settlement of this claim.

10.     Additional Documents. The Parties hereby agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the terms and intent of this Settlement Agreement.

11.     Non-Disparagement. The Parties covenant that they shall not, from and after the date of this Settlement Agreement make disparaging statements about the other, orally or in writing, or online, or cause third parties to make disparaging public statements about the other in any manner, and that comments regarding the Litigation and this Settlement Agreement shall be limited to an acknowledgement that the Litigation and all related claims have been settled to the mutual satisfaction of each Party.

Counterparts. This Settlement Agreement may be executed in counterparts each of which shall be considered an original.

IN WITNESS HEREOF, I/we have hereunto set my/our hand(s) on this 19th day of November, 2012.

SSG1468v.2

Phat Trax 2,

By: _____
Its: _____

By: _____
Its: _____

R&L Records, Inc.,

By: _____
Its: _____

By: _____
Its: _____

R&L Publishing,

By: _____
Its: _____

By: _____
Its: _____

Saber Records Ltd.

By: _____
Its: _____

By: _____
Its: _____

Saber Records

By: _____
Its: _____

By: _____
Its: _____

J5011406v.2

Hot Mix 5 Records,

By: _____
Its: _____

By: _____
Its: _____

Housetime Records,

By: _____
Its: _____

By: _____
Its: _____

Dangerous Records,

By: _____
Its: _____

By: _____
Its: _____

Demand Records,

By: _____
Its: _____

By: _____
Its: _____

MAAD Records

By: _____
Its: _____

By: _____
Its: _____

Precision Record Labs, Ltd.

By: _____
Its: _____

By: _____
Its: _____

Scream Diva Records,

By: _____
Its: _____

By: _____
Its: _____

CASABLANCA TRAX
LIMITED PARTNERSHIP

By:  Casablanca Trax Inc., a Province
     Of Ontario corporation,
     Its General Partner

     By: _____
              President

Trax Records, Inc.,

By: _____
Its: _____

By: _____
Its: _____

Sanlar Publishing,

By: _____
Its: _____

By: _____
Its: _____

Phat Trax,

By: _____
Its: _____

By: _____
Its: _____


LARRY SHERMAN
_____

Subscribed and Sworn to
Before me this _____ day of November, 2012

_____
        Notary Public

_____
RACHAEL CAIN

150114466v.2

## Non-Recourse Assignment

KNOW ALL MEN BY THESE PRESENTS, that Casablanca Trax Inc., a corporation of Ontario, Canada ("Grantor"), for $10.00 and other consideration received hereunder, the receipt and sufficiency of which is acknowledged, does hereby and herewith transfer, set over, assign, sell, grant, and quitclaim to Rachael Cain and Larry Sherman ("Grantee") all of Grantor's right, title, interest, of any type or kind, in and to the personal and intellectual property pledged or otherwise granted, transferred or assigned by the Trax-related parties and Rachael Cain and Larry Sherman to Casablanca Trax Inc. pursuant to that certain Loan Agreement and Security Agreement and Joint Venture Agreement, as amended, dated on or about December 1, 2003, including all past and future rights, and as partially identified on Exhibit A hereto (collectively, the "Trax Catalogue"), subject only to existing and enforceable licenses, the terms of which Grantee fully accepts, and without recourse or warranty of any kind whatsoever (whether or not such right of recourse is now known or may hereafter come into existence).

The scope and breadth of this Assignment are intended to be broad and to include all interests of any kind that Grantor has, had, claimed to have, or could have had, whether legal, equitable, or possessory, in and to the Trax Catalogue, its masters, its artists, its assets, or its management. This Assignment also includes all Grantor's rights to or possession of any other personal or intellectual property located in the storage unit in Chicago, Illinois.

This assignment and release, and Grantee's acceptance and granting of the same, is subject only to Grantee's pledge and covenant not to interfere with or in any way harass any licensee or sub-licensee of the Trax Catalogue or any part or section of it, during the term of such license, or cause any third party to do the same .

This Assignment is in full and final settlement of all claims by and between the parties hereto, and effectuates the full release of all such claims by the Parties, including the officers, directors, employees, affiliates, attorneys, counselors, accountants, members, shareholders, representatives, estates, successors, agents and assigns, past and present, of each of them.

Casablanca Trax Inc.,

By: _____
Its: _____President_____

Trax Records, Inc.,                          Trax Records,

By: _____         By: _____
Its: _____         Its: _____

By: _____         By: _____
Its: _____         Its: _____

{00141731.DOC / 3}
15011548v.2

Sanlar Publishing,

By: _____
Its: _____

By: _____
Its: _____

Phat Trax 2,

By: _____
Its: _____

By: _____
Its: _____

R&L Publishing,

By: _____
Its: _____

By: _____
Its: _____

Saber Records

By: _____
Its: _____

By: _____
Its: _____

Housetime Records,

By: _____
Its: _____

By: _____
Its: _____

Phat Trax,

By: _____
Its: _____

By: _____
Its: _____

R&L Records, Inc.,

By: _____
Its: _____

By: _____
Its: _____

Saber Records Ltd.

By: _____
Its: _____

By: _____
Its: _____

Hot Mix 5 Records,

By: _____
Its: _____

By: _____
Its: _____

Dangerous Records,

By: _____
Its: _____

By: _____
Its: _____

Demand Records,

By: _____
Its: _____

By: _____
Its: _____


MAAD Records

By: _____
Its: _____

By: _____
Its: _____


Precision Record Labs, Ltd.

By: _____
Its: _____

By: _____
Its: _____

Larry Sherman,

_____


Scream Diva Records,

By: _____
Its: _____

By: _____
Its: _____

Rachael Cain.

_____